IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MONEY LANOS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:04CV01019 HEA (AGF) |
| | ) | |
| DAVE DORMIRE, | ) | |
| | ) | |
| Respondent. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pro se petition of Missouri state prisoner Money Lanos for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action was referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that federal habeas relief be denied.

On December 9, 1998, Petitioner was found guilty by a jury of four counts of first-degree robbery, and one count of second-degree robbery. The crimes took place on March 11, 13, 14, 16, and 17, 1997. Petitioner was sentenced as a prior and persistent offender to 15 years imprisonment on each of the first-degree robbery counts, and to 10 years imprisonment on the second-degree robbery count, with all sentences to run consecutively. On December 28, 1999, the convictions and sentences were affirmed on direct appeal. Petitioner filed a motion for post-conviction relief on August 4, 2000. The motion was denied, and this denial was affirmed on appeal on March 16, 2004.

In the present timely-filed habeas action, Petitioner claims that his constitutional rights were violated in the following ways:

His written statement to the police was improperly admitted at trial, as it was obtained after he had unequivocally requested an attorney and before one had been provided to him;

An out-of-court and an in-court identification of him were improperly admitted at trial, as they were the result of an overly suggestive lineup;

Evidence and argument regarding other bad acts by Petitioner were improperly admitted at trial; and

Appellate counsel was ineffective in failing to challenge on direct appeal the trial court's denial of Petitioner's motion to sever the offenses for separate trials.

## BACKGROUND

### Motions to Suppress and Motion for Severance

A hearing was held on July 21, 1998, on Petitioner's motions to suppress a written statement he had given to the police following his arrest, and to suppress the in-court and out-of court identifications of the victim of one of the robberies. Petitioner maintained that the written statement was obtained by the police after Petitioner's request for an attorney was not honored. He argued that the identifications in question were based upon an impermissibly suggestive lineup.

Police Detective Thomas Rund testified at the hearing that he stopped Petitioner on the street (at about midnight to 1:00 a.m. on March 19, 1997) and arrested him because Petitioner matched the description of an individual who had committed several street robberies in the area, and also because Petitioner was wanted on a warrant for stealing

under $150 (a misdemeanor).  Rund testified that he advised Petitioner of his constitutional rights, including the right to an attorney and to have one appointed for him if he could not afford one.  Petitioner did not request an attorney, and he was taken to the police station for questioning about the robberies.  At the station, Petitioner admitted that he had approached one of the robbery victims the night before on the street and asked her for money.  The police contacted the victim of this robbery, Bridgette Sinar, and arranged a lineup for her to view.  Resp. Ex. 7 at 142-49.

Rund further testified that when the police told Petitioner that he was going to be placed in a lineup, he asked the police to contact an attorney by the name of Terrence Niehoff.  This was at about 1:50 a.m. on March 19.  Rund testified that the police tried to "get a hold of" Niehoff but were unable to, and proceeded with the lineup.  Petitioner resisted by lying on the floor.  Rund testified that Petitioner "was very passive, stating that he wasn't going to stand up," and so two officers were called to "hold [Petitioner] up" for the lineup.  According to Rund, when Sinar viewed the lineup, Petitioner "was standing up, but I don't believe he was standing up by that time on his free will," and the officers were standing next to him or behind him.  Id. at 151, 168.  Rund could not recall whether the officers were in uniform or not.  He further testified that when Sinar viewed the lineup, all resistence had stopped and Petitioner was standing erect.  Id. at 176.  There were four participants in the lineup, in addition to Petitioner.  When asked why the police conducted the lineup so early in the morning, Rund responded, "Because I felt that time was of essence.  Individual's locked up for a petty misdemeanor charge, and nobody could guarantee me the subject would have been let out."  Rund testified that Sinar

identified Petitioner as the man who had robbed her.  Id. at 149-51, 168-77.

Following the lineup, the police again advised Petitioner of his rights, and gave him a "warning and waiver form," which listed these rights.  Petitioner initialed each right, indicating that he understood it, and then he signed the form.  Rund testified that Petitioner did not request an attorney at this point.  At approximately 2:30 a.m., Petitioner provided a written statement in which he admitted that in the past two or three weeks, he had robbed four or five people in the area of the crimes because he needed money to pay drug debts and to provide food for his godson.[1]  Rund testified that he made no threats or promises to Petitioner to get him to provide the statement.  The police again tried to contact Niehoff "in the morning" and left a message with his secretary "informing him of the information."  Later in the day, the victims of three of the other robberies identified Petitioner from a lineup, and the fourth victim identified him from a photo lineup.  Id. at 152-59, 178-82.

Petitioner testified at the suppression hearing, that after he told the police about his encounter with Sinar, he told them that he did not want to talk to them anymore.  The police then told him that they were taking him for a lineup, and he told them that he did not want to participate, and that he wanted them to call Niehoff, who would "come down and make sure everything's done right as far as the lineup or anything else."  Petitioner testified that the police looked for Niehoff's number in a phone book, and then told him that they tried to call him but could not reach him.  Petitioner sat down on the floor and

---

[1]     A copy of this statement appears as an appendix to Resp. Ex. 12.

said that he wanted his attorney.  Two officers got him to stand up by twisting his wrist.

After that, Petitioner said that he would stand up.  He testified that he was holding his

wrist as he stood up in the lineup, and that officers stood next to him.  Petitioner denied

the truth of his confession, stating that the police indicated to him that they would hurt

him if he did not provide a written statement.  Id. at 184-98.

The trial court denied both motions to suppress.  The court stated that "based upon

the preponderance of the evidence," it found that Petitioner's oral and written statements

were not coerced or involuntary, and also found "credible that none of [the]

identifications were the result of impermissible suggestiveness on the part of the police

officers."  Id. at 207.

The five robbery charges were joined for trial.  Petitioner filed a motion to sever

the offenses for separate trials, arguing that the jury would likely consider evidence of

guilt on one charge as evidence of guilt on another charge.  Resp. Ex. 3 at 18-19.  The

motion was denied.  Id. at 20.

**Trial**

During opening statement, the prosecutor referenced the part of Petitioner's

written confession where Petitioner stated that he had committed the crimes because he

owed "dope money."  Resp. Ex. 1 at 143.  Rund testified at trial that on or about March

17, 1997, he was assigned to investigate several street robberies, including the Sinar

robbery, that had occurred in the past week, all within several blocks of each other.  In

each case, the perpetrator had stopped a woman who was alone on the street, asked her

for money or jewelry, displayed or suggested that he had a dangerous weapon, and left

(twice on a bicycle and three times on foot) with the money/jewelry given to him.  Rund had a description of the perpetrator and of a brown outfit he wore at one or more of the robberies, and through Rund's investigation, he was able to determine that an individual matching the description frequented an apartment in the area.  The tenant provided Petitioner's name, and in a consent search of the apartment, the officers recovered a pair of brown/tan overalls.  Close to midnight that day, Rund stopped Petitioner as Petitioner was walking down the street in the area, because Petitioner fit the description of the robber.  When asked his name, Petitioner gave another name with which Rund was familiar.[2]

Rund continued that he arrested Petitioner, found a can opener in Petitioner's pocket, advised Petitioner of his Miranda rights, and took Petitioner to the police station. In response to questioning regarding what he had advised Petitioner of at the time of his arrest, Rund testified that he advised Petitioner that he was also "wanted for a capias warrant."  Counsel's objection to this last comment was sustained and the jury was told to disregard it, but at a bench conference, the court denied Petitioner's motion for a mistrial. Id. at 212-31.  Rund testified that on the way to the station, Petitioner confessed to the Sinar robbery.  Id. at 243-44.  Rund described the first lineup, essentially consistent with his testimony at the suppression hearing, except that at trial, Rund clarified that the two police officers who picked up Petitioner from the floor in the lineup room, did so while Sinar was watching, and were in uniform.  Id. at 248-53.  Rund also testified as to the out-

---

[2]   In light of an objection by Petitioner, the prosecutor did not have Rund clarify that he knew this as an alias used by Petitioner in connection with prior arrests.  Id. at 226-227.

of-court identifications made by the other victims.  Id. at 236-39.

Each of the five victims testified that she had identified Petitioner in a police lineup, one being a photo lineup.  Each victim also identified Petitioner in court as her assailant.  Sinar testified that between 9:00 and 10:00 p.m. (on March 17, 1997), a man approached her in the street, and said, "Give me your purse or I'll kill you."  When she started to hand him her purse, he told her that she should just give him her money.  Sinar testified that the robber was wearing pale yellow brown overalls, which were worn, and that he had a hood on his head.  He displayed a shiny silver weapon, the exact nature of which she could not identify.  Sinar testified that after she gave the robber $60 from her purse, he said, "I'm really sorry, but I have to pay the dope man," and walked away.  Id. 192-95.

Sinar testified that she spoke to the police about one-half hour after the incident, and gave them a description of the robber.  She testified that although it was dark outside, the area of the crime was well lit with street lights.  She described the robber to the police as African-American, 34 to 35 years old, weighing approximately 170 pounds, of medium build, and  5' 11" to 6' tall.   It is undisputed that Petitioner, in fact, was 25 years old, weighed approximately 130 pounds, and was 5' 8" tall.  Sinar testified that she thought she told the police that the robber had stubble, "like he hadn't shaved."  In response to defense counsel's question on whether she got a good look at the robber's face, Sinar replied, "Not a real good look."  She then stated that although she may not have described anything discerning about the robber's face to the police, she "recognized him when [she] saw him."  Id. at 201-04.

Sinar testified that when she viewed the lineup at the police station, she saw that another individual was standing next to Petitioner, who put his hands on Petitioner to have him look up. She characterized Petitioner as being "uncooperative," which she found "odd." When asked by defense counsel whether her identification of Petitioner at the lineup was based on these circumstances in any way, Sinar replied, "No. That's why I was there for all those minutes because I wanted to look right at his face." Sinar testified that the overalls seized by the police were the ones that her assailant had been wearing, and she made an in-court identification of Petitioner, over defense counsel's objection. Id. at 192-210.

Petitioner's written confession obtained by the police after the Sinar lineup was admitted into evidence. In closing argument, the prosecutor commented that Petitioner committed the robberies because he had a drug habit that he needed to pay for. Id. at 315. The jury was given five separate verdict-directing instructions and five separate verdict forms, each related to one of the counts in the case. The jury was also instructed that it had to consider each count separately and return a separate verdict on each count. Resp. Ex. 2 at 46-53. The jury found Petitioner guilty on all counts.

**Direct Appeal**

Petitioner raised three points on direct appeal: (1) his written confession was improperly admitted because it was obtained in violation of his right to counsel; (2) his due process rights were violated by the admission of Sinar's out-of-court and in-court identifications, because they were based on an impermissibly suggestive lineup, and were not independently reliable; and (3) his due process rights were violated by the

introduction at trial of evidence of other crimes committed by Petitioner, namely that he was an illegal drug user and that he was wanted on a warrant when he was stopped and arrested.  Resp. Ex. 12.

The Missouri Court of Appeals rejected all of Plaintiff's arguments, and affirmed the convictions.  The appellate court, noting that Petitioner asked for counsel when he was told that he was going to be placed in a lineup, held that he "did not make an unambiguous and specific request for counsel in dealing with a custodial interrogation," and that no threats or promises were made to Petitioner for completing the written statement.  Thus, the trial court did not err in denying the motion to suppress the written statement.  On Petitioner's next point on appeal, the appellate court held, citing a state case, that Petitioner could not challenge the suggestiveness of the Sinar lineup because the suggestiveness of the officers' conduct was "due to circumstances that he caused to become necessary."  Resp. Ex. 6.

The appellate court also rejected Petitioner's last claim.  The court held that the mention of the outstanding warrant (by Rund) was a "vague and indefinite reference to an unspecified crime."  The court  noted that the trial court had instructed the jury to disregard the comment.  With respect to the admission of evidence of his illicit drug use, the appellate court held that Petitioner did not preserve the issue for review because he did not object at trial to this evidence, and did not include the point in his motion for a new trial.  Petitioner was not entitled to plain error review of the matter, review which was to be used only where manifest injustice was involved.  Id.

**Post-conviction Proceedings**

In an amended motion for post-conviction relief filed pursuant to Missouri Supreme Court Rule 29.15, Petitioner argued that appellate counsel was ineffective for failing to argue on direct appeal that the trial court should have granted Petitioner's motion to sever. Petitioner set forth dissimilarities between the five robberies, such as what Petitioner was wearing each time. Petitioner argued that the jury likely considered evidence of guilt on one charge as evidence of guilt on other charges, and that had appellate counsel raised this issue, Petitioner would have been granted five separate new trials. Resp. Ex. 8 at 37-45.

The motion court stated that it was "[m]indful of the [Missouri] rule favoring liberal joinder." The court (mistakenly) stated that no motion to sever was ever filed on Petitioner's behalf. The court went on to hold that joinder of the offenses here was proper under Missouri law, as "they were of the same or similar character, occurred within a short span, and within the same area," and that Petitioner failed to meet the burden of showing a "particularized burden of substantial prejudice" to warrant severance, under Missouri law. Id. at 50-53.

On appeal, the Missouri Court of Appeals noted the motion court's error in stating that a motion to sever had not been filed. The appellate court then found that joinder was proper because, although the crimes were not identical, Petitioner's choice of victims and tactics were sufficiently similar to allow joinder. The court also rejected Petitioner's argument that the jury likely considered evidence of guilt on one charge as evidence of guilt on other charges. The court noted that the facts of the five incidents were

"straightforward and distinct," and that the jury was instructed separately on each count. In sum, the court concluded that "nothing in the record indicated that the jury was unable to distinguish between the victims and the evidence relevant to each."  Therefore, the court concluded, appellate counsel was not ineffective for failing to raise this "non-meritorious" argument on appeal.  Resp. Ex. at 11.

## DISCUSSION

### Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" clause is satisfied if a state court has arrived "'at a conclusion opposite to that reached by [the Supreme Court] on a question of law'" or "'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent'" but arrives at the opposite result.  Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)).  A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Williams, 529 U.S. at 413; Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003). A case cannot be overturned merely because it incorrectly applies federal law, for the application must also be "unreasonable." Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003) (under AEDPA, a writ of habeas corpus may not be granted "unless the relevant state court decision is both wrong and unreasonable").

The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to "an even more deferential review." Id. A state court decision involves an unreasonable determination of the facts in light of the evidence presented in state court proceedings, "only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." Jones v. Luebbers, 359 F.3d 1005, 1011 (8th Cir. 2004). "The standard is demanding but not insatiable; . . . deference does not by definition preclude relief." Miller-El v. Dretke, 545 U.S. 231, 240 (2005).

## Written Confession

Petitioner claims that the trial court should have suppressed his written confession because it was obtained after he asked for counsel, and without counsel having been provided. In Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court held, based on the Fifth Amendment, that an accused who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85. The Court further held that once the accused has invoked the right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated

custodial interrogation even if he has been advised of his rights." Id. at 484.

A "suspect must unambiguously request counsel," and if he does not "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney . . . Edwards does not require that the officers stop questioning the suspect." Davis v. United States, 512 U.S. 452, 459 (1994). Moreover, a "limited invocation" of the right to counsel for one purpose is not effective for other purposes. Conn. v. Barrett, 479 U.S. 523, 528 (1987) (holding that arrestee's invocation of his right to counsel with respect to giving a written confession did not require suppression of his oral confession where he expressed a willingness to give the oral statement); United States v. Jacobs, 97 F.3d 275, 280 (8th Cir. 1996) ("a limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation"; where after waiving his Miranda rights, accused stated during interrogation that he would want a lawyer in the event he had to take a polygraph test, his statements made after this request were admissible, where he was never given a polygraph test).

Here, the state appellate court concluded that Petitioner "did not make an unambiguous and specific request for counsel in dealing with a custodial interrogation." The court stated that after he was told that he would be placed in a lineup, Petitioner provided Rund with the name of an attorney Petitioner wished contacted, but that Petitioner did not have a Fifth Amendment right to a pre-charge lineup. Thus it is clear that the state court concluded that Petitioner's request for an attorney was limited to the lineup. Petitioner testified at the suppression hearing that he told the police after his oral statement

about the Sinar robbery, that he did not want to talk to them anymore, and that he told the police that he wanted to contact counsel who would "make sure everything's done right as far as the lineup or anything else."  The state courts, however, were not required to accept Petitioner's version of events.  This Court cannot say, on habeas review, that the record mandates a finding that Petitioner unequivocally "expressed his desire to deal with the police only through counsel" for purposes beyond the lineup.  The state appellate court's finding that no threats or promises were made after the lineup to obtain Petitioner's written confession also finds support in the record.  In sum, the Court does not believe that the state courts' adjudication of this issue resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented at the suppression hearing or at trial.

In any event, the Court concludes that Petitioner is not entitled to reversal of his convictions on the ground that his written confession was erroneously admitted into evidence, because even without his confession, the evidence of Petitioner's guilt as to each of the offenses was extremely strong.  In Arizona v. Fulminante, 499 U.S. 279 (1991), the Supreme Court applied a harmless error analysis to the erroneous admission of a confession, holding that the error would be harmless if it did not "contribute to [petitioner]'s conviction."  Fulminante, 499 U.S. at 296.  Recently, in Fry v. Pliler, 127 S. Ct. 2321, 2327 (2007), the Supreme Court explained that the more lenient "substantial and injurious effect" standard rather than the "harmless beyond a reasonable doubt" standard applied when assessing the prejudicial impact of a federal constitutional error in a state

criminal trial.

The Court is mindful that a defendant's confession is not just another piece of evidence. "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." Fulminante, 499 U.S. at 296. Here, however, there was other compelling evidence against Petitioner as to each robbery. Testimony of Petitioner's oral statement regarding the robbery of Sinar was properly admitted. This oral statement was made before the challenged lineup and provided strong evidence of Petitioners's guilt of that crime. There was also other evidence of Petitioner's guilt of the Sinar robbery, including the can opener seized at the time of Petitioner's arrest, and Sinar's positive identification of the overalls seized from Petitioner's friend's apartment. The identifications of the four remaining victims would render an erroneous admission of the written confession harmless as to the convictions for those four robberies. See Mathenia v. Delo, 975 F.2d 444, 449 (8th Cir. 1992) (while death-penalty habeas petitioner's "graphic confession was destructive to his defense, it was far from the only evidence against him" in that his step-sister testified at the trial that he told her he had committed the murders; the district court was correct in finding that the defense was not prejudiced since the outcome would not have been different had the confession been suppressed); Hopkins v. Cockrell, 325 F.3d 579, 585 (5th Cir. 2003) (any error in admitting habeas petitioner's confession was harmless in light of the overwhelming amount of circumstantial evidence against petitioner). In sum, the Court concludes that Petitioner's first ground for habeas relief is without merit.

**Identification Evidence**

Petitioner argues that the admission of Sinar's out-of-court and in-court identifications violated his due process rights to a fair trial.  He argues that the lineup in question was so impermissibly suggestive that it tainted Sinar's identifications of Petitioner, and that there were insufficient independent indicia of reliability of her identifications.  Respondent responds that the Missouri Court of Appeals correctly disposed of this claim by holding that Petitioner could not challenge the suggestiveness of the lineup because he caused the suggestiveness.

Due process challenges to identifications are reviewed under a two-step test:  The first step is to determine whether the challenged confrontation between the witness and the suspect was "impermissibly suggestive"; if so, the second inquiry is whether, under the totality of the circumstances, the suggestive confrontation created "a very substantial likelihood of irreparable misidentification."  Manson v. Brathwaite, 432 U.S. 98, 116 (1977).   Those identifications which are reliable  -- where the witness's perception of the suspect unaided by the suggestive confrontation provided a sufficient foundation for the identification -- are admissible.  Reliability "is the linchpin in determining the admissibility of identification testimony."  Id. at 114.  Exclusion is required only where there is "'a very substantial likelihood of irreparable misidentification.'"  Id. (quoting Simmons v United States, 390 U.S. 377, 384 (1968).  "Short of that point, such evidence is for the jury to weigh."  Id.

Reliability is determined by examining (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention at the time of the

crime, (3) the accuracy of his prior description of the criminal, (4) the level of certainty

demonstrated at the confrontation, (5) and the time between the crime and the

confrontation.  Manson, 432 U.S. at 114 (citing Neil v. Biggers, 409 U.S. 188, 199-200

(1972)).  Against these factors is to be weighed the corrupting effect of the suggestive

identification itself.  Id.; Manning v. Bowersox, 310 F.3d 571, 577 (8th Cir. 2002).

     Here the state appellate court did not reach the reliability step because it found that

Petitioner could not challenge the suggestiveness of the lineup because his own conduct

necessitated that suggestiveness.  The court relied upon state law to support this conclusion.

The only federal case on the matter cited by Respondent is Thrasher v. Armontrout, 784

F.2d 327 (8th Cir. 1986).  Although the Court in Thrasher, faced with very similar facts,

found the identification to be admissible, the Court there did not reach this "created

suggestiveness" issue, but rather determined that the identification was admissible in light

of its reliability under the Neil v. Biggers factors.

     While this Court has not found definitive guidance in federal case law on the issue at

hand, at least one federal case indicates that where an accused's conduct occasions a

suggestive aspect of a lineup, the accused cannot then challenge the suggestiveness on

constitutional grounds.  See United States v. Jones, 907 F.2d 456, 459-60 (4th Cir. 1990)

(rejecting argument that lineup was impermissibly suggestive because the defendant was

asked to repeat a statement uttered by the perpetrator, where the request was made only

because the defendant had spoken softly the first time), vacated on other grounds, 977 F.2d

105 (1992).  What is clear is that Petitioner has not shown that the decision of the Missouri

Court of Appeals was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," as required for federal habeas relief under 28 U.S.C. § 2254(d) (2).  Cf. Kane v. Garcia Espitia, 546 U.S. 9, 11 (2005) (per curiam) (reversing grant of habeas relief where Supreme Court case relied upon did not clearly establish right petitioner claimed was violated).

Furthermore, although the state appellate court did not reach the question of the reliability of Sinar's identifications, this Court believes that a fair reading of the trial court's ruling on motion to suppress identifications establishes that the trial court implicitly held that Sinar's identification was reliable despite the suggestiveness of the lineup.  Upon review of the record, this Court agrees with that assessment.  Sinar did state on cross-examination that she did not get "a real good look" at Petitioner, and the description she gave the police of the robber cannot be said to have been accurate, other than that he was African-American.  But she stated that the lighting was good at the scene of the robbery, and she accurately described Petitioner's brown overalls that he was wearing.  She had ample opportunity to view the robber, with whom she had a face-to-face conversation, and as she was the victim, and not a casual witness, her degree of attentiveness would have been high.  Only one day elapsed between the crime and the lineup, and the record suggests that Sinar's level of certainly at the lineup was high.  Under the totality of circumstances, this Court concludes that Sinar's identifications of Petitioner were inherently reliable, despite the suggestive features of the lineup, and were thus properly admitted at trial.  See Clark v. Caspari, 274 F.3d 507, 511-12 (8th Cir. 2001) (holding that showup identifications of robbery suspects by robbery eyewitnesses within half hour of crime were reliable and therefore admissible, despite questionable circumstances surrounding identifications,

including showing black suspects in handcuffs while surrounded by white officers and failing to separate eyewitnesses, where eyewitnesses had ample opportunity to observe perpetrators at time of crime, and there was no evidence of police prompting).

Finally, with regard to this issue, the Court concludes that even if the admission of Sinar's identifications was error, it was harmless error, in light of the other evidence of Petitioner's guilt of this robbery, including Petitioner's pre-lineup statement about his encounter with Sinar, the can opener seized from him shortly after the robbery, and Sinar's identification of the seized overalls.  Thus, the Court concludes that the identification evidence in question did not have such a "substantial and injurious effect" on the jury's verdict on Count I (the robbery of Sinar) as to warrant habeas relief.  See Fry, 127 S. Ct. at 2327 (standard of review); Evans v. Lock, 193 F.3d 1000, 1003 (8th Cir. 1999) (holding that even under the harmless-beyond-a-reasonable-doubt standard, the erroneous admission of identification evidence did not warrant habeas relief, given the overwhelming evidence, on the record as a whole, of the petitioner's guilt).

**State's Reference to Other Crimes**

Petitioner argues that his due process rights were violated by the various references during the trial to his being a drug user, and by Rund's testimony that Petitioner was wanted for another crime.  He maintains that these references allowed the jury to convict him based upon prior misconduct, rather than the evidence relevant to the charged crimes.

The Supreme Court has explicitly left open the question of whether the admission of evidence of other crimes solely to prove propensity violates due process.  See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) ("[W]e express no opinion on whether a state law

would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").  As Petitioner cannot point to any holding of the Supreme Court that supports his claim, it cannot be said that the Missouri Court of Appeals' decision rejecting this due process challenge was "contrary to" any "clearly-established" federal law as determined by the Supreme Court.  See Bugh v. Mitchell, 329 F.3d 469, 512 (6th Cir. 2003); Hirsch v. Brigano, 2003 WL 21949184, at *3 (6th Cir. 2003); cf. Kane, 546 U.S. at 11.

In any event, the Court concludes that the state courts' handling of this issue was not legally or factually unreasonable.  With regard to the mention by Rund of the capias warrant, the jury was instructed to disregard the comment, and furthermore, the comment did not reference any specific crime.  See, e.g., Young v. Bowersox, 161 F.3d 1159, 1161 (8th Cir. 1998) (prosecutor's question improperly suggesting to the jury that habeas petitioner had prior bad acts did no violate petitioner's right to a fair trial where question did not refer to any specific past acts, and evidence of petitioner's guilt was strong).

With regard to the challenged references to Petitioner's drug use, there is little to suggest that this evidence was improperly admitted at all, given Petitioner's repeated admissions, both to the police and to the victims, that this was the reason for the robberies.  See United States v. Davis, 103 F.3d 660, 672 (8th Cir. 1996) (explaining that bad acts that form the factual setting of the crime in issue are admissible).  Regardless, these references did not so infect the trial as to violate Petitioner's due process rights to a fair trial.[3]

_____

[3]   Respondent argues that this aspect of Petitioner's third ground for habeas relief was procedurally defaulted in state court because Petitioner did not object to the statements in

**Ineffective Assistance of Appellate Counsel**

Petitioner argues that appellate counsel was ineffective in failing to challenge on direct appeal the trial court's denial of Petitioner's motion to sever the offenses for separate trials.  Petitioner argues that he was prejudiced by the joinder of offenses in that his ability to defend against the five individual charges was hampered by the introduction of evidence on the unrelated charges, which the jury may have confused or used improperly to convict Petitioner.  He further argues that a reasonably competent attorney would have made this claim on direct appeal, and would have prevailed, securing for Petitioner a new separate trial on each offense.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of trial and direct appeal counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 689.  When a claim involves appellate counsel's failure to raise a certain argument, a habeas petitioner must show that there is a reasonable probability that the result of the direct appeal would have been different if the argument had been made.  Smith v. Robbins, 528 U.S. 259, 285 (2000) (applying the two-part Strickland analysis to appellate counsel).

---

question at trial.  While this argument appears to have merit, the Court chooses to address the merits of the claim rather than to engage in an analysis of procedural default.  See Nance v. Norris, 392 F.3d 284, 291 (8th Cir. 2004) (a court may by-pass a procedural default question and proceed to the merits).

> When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain an ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims. . . . . Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.

Id. 528 U.S. at 288 (citations omitted); see also Link v. Luebbers, 469 F.3d 1197, 1205 (8th Cir. 2006). Moreover, in the context of a § 2254 petition, a Petitioner "must do more than show that he would have satisfied the Strickland test if his claims were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly." Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004)(quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)). "Rather, he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner." Id.; see also Scarberry v. Iowa, 430 F.3d 956, 959 (8th Cir. 2005) (applying this standard of review to a claim that direct appeal counsel was ineffective), cert. denied, 126 S. Ct. 280 (2006).

Here Petitioner appears to be arguing that counsel was ineffective for failing to argue on direct appeal both that (1) the offenses were improperly joined under Missouri law, and that (2) the joiner violated Petitioner's federal due process rights. The Court concludes that Plaintiff is not entitled to habeas relief based upon either of these arguments. The state courts found that the joiner was proper under Missouri law, and this Court will not re-examine that question. See Kelly v. Kemna, 2001 WL 792548, at *2 (8th Cir. July 16, 2001) (citing in this context Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) for the proposition that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

With respect to appellate counsel's failure to raise a federal due process claim based upon the failure to sever the offenses, the Court notes that a criminal defendant's due process rights are violated where the failure to grant a motion to sever offenses that have been joined for trial "rendered the trial fundamentally unfair."  Wharton-El v. Nix, 38 F.3d 372, 374 (8th Cir. 1994).

> The argument against joinder [of offenses] is that the defendant may be prejudiced for one or more of the following reasons: . . . the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime . . . charged; or . . . the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find.  A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one.
>
> *   *   *
>
> The courts have also recognized the danger in joinder of offenses that arises from the difficulty of presenting separate defenses to each offense charged, especially where the defendant may want to testify with respect to one offense but not the other.  Prejudice sufficient to require separate trials on that basis, however, may be established only by "a persuasive and detailed showing regarding the testimony [that the defendant] would give on the one count he wishes severed and the reason he cannot testify on the other counts."

Closs v. Leapley, 18 F.3d 574, 578 (8th Cir. 1994) (citations omitted).

Even where the evidence of one of the offenses joined for trial would not be admissible in a separate trial of another joined offense, federal courts "have found no prejudicial effect from joinder when the evidence of each crime is simple and distinct . . . . This rests upon the assumption that, with a proper charge, the jury can easily keep such evidence separate in their deliberations and, therefore, the danger of the jury's cumulating the evidence is substantially reduced."  Id.; see also Wharton-El, 38 F.3d at 374-75.

Here, the Missouri Court of Appeals concluded although the crimes were not identical, Petitioner's choice of victims and tactics were sufficiently similar to allow joinder. The court also concluded that the facts of the five robberies were straightforward and distinct, and that nothing in the record indicated that the jury was unable to distinguish between the victims and the evidence relevant to each. The court noted that the jury was instructed separately on each count. These conclusion are not based upon an unreasonable determination of the facts in light of the evidence at trial.

Nor did the state appellate court's rejection of Petitioner's claim that appellate counsel was ineffective for failing to raise the severance claim on direct appeal, involve an unreasonable application of Supreme Court law. See Closs, 18 F.3d at 578 (holding that there was no deprivation of due process in trial court's failure to give petitioner separate trials with respect to break-ins of house and car; evidence with respect to charged crimes was simple and distinct enough so that there was no reasonable possibility of jury confusion or undue influence); Wharton-El, 38 F.3d at 374-75 (holding that the failure to grant severance of defendant's robbery charges did not render defendant's trial fundamentally unfair, where, although defendant alleged that evidence supporting conviction in one robbery was stronger than evidence supporting conviction in other robbery, state appellate court reasonably held that two robberies were part of common scheme or plan, and trial court instructed jury to determine defendant's guilt for each count separately).

## CONCLUSION

The Court does not believe that reasonable jurists might find the Court's assessment

of the issues in this case debatable or wrong, for purposes of issuing a Certificate of

Appealability under 28 U.S.C. § 2253(c)(2).  See Slack v. McDaniel, 529 U.S. 473, 484-85

(2000) (setting forth the standard for issuing a Certificate of Appealability); Langley v.

Norris, 465 F.3d 861, at 862-63 (8th Cir. 2006) (same).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the petition of Money Lanos for habeas

corpus relief be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability not be

issued in this case.

The parties are advised that they have ten (10) days in which to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an

extension of time for good cause is obtained, and that the failure to file timely objections

may result in a waiver of the right to appeal questions of fact.


_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of July, 2007.